1
2
3
4
5
6
7
8
9

**UNITED STATES DISTRICT COURT**

10

**CENTRAL DISTRICT OF CALIFORNIA-EASTERN DIVISION**

11
12

GUADALUPE IONESCU,                    )    Case No. ED CV 14-01446-AS
                                      )
13              Plaintiff,            )    **MEMORANDUM OPINION**
                                      )
14        v.                          )
                                      )
15   CAROLYN W. COLVIN, Acting        )
     Commissioner of Social           )
16   Security,                        )
                                      )
17              Defendant.            )
     _____)
18
19
20                          **PROCEEDINGS**

21        On July 21, 2014, Plaintiff, proceeding *pro per*, filed a Complaint

22   seeking review of the denial of her application for Disability Insurance

23   Benefits.  (Docket Entry No. 3).  The parties have consented to proceed

24   before the undersigned United States Magistrate Judge.  (Docket Entry

25   Nos. 9-10).  On November 26, 2014, Defendant filed an Answer along with

26   the Administrative Record ("AR").  (Docket Entry Nos. 12-13).  On April

27   29, 2015, Plaintiff filed an Amended Motion for Summary Judgment

28

("Motion").   (Docket Entry No. 20).[1]   On May 29, 2015, Defendant filed a Cross-Motion for Summary Judgment ("Cross-Motion"). (Docket Entry No. 23).

The Court has taken this matter under submission without oral argument.   See C.D. Cal. L.R. 7-15; "Order Re: Procedures in Social Security Case," filed July 23, 2014, and April 23, 2015 Order Granting Plaintiff's request for an extension of time to submit motion for summary judgment (Docket Entry Nos. 7, 19).

## BACKGROUND AND SUMMARY OF ADMINISTRATIVE DECISION

On November 3, 2010, Plaintiff, formerly employed as a customer service representative/order clerk (see AR 158, 187, 196), filed an application for Disability Insurance Benefits, alleging a disability since May 15, 2005.   (AR 74, 140-43).   On May 14, 2012, the Administrative Law Judge ("ALJ"), Helen E. Hesse, heard testimony from Plaintiff (who was represented by counsel), psychological expert Joseph Malancharuvil, and vocational expert Alan L. Ey. (See AR 44-73).   On September 4, 2012, the ALJ issued a decision denying Plaintiff's application.   (See AR 22-34).   The ALJ found that, through the date last insured (December 31, 2010, AR 24), Plaintiff had severe impairments -- "adjustment reaction with depressive symptoms; chronic pain syndrome; status post right carpal tunnel release; and fibromyalgia" (AR 24-25) --

---

[1]   Plaintiff mislabeld her motion as an "Amended Motion." See Court Order dated May 4, 2015 (Docket Entry No. 22).

but did not have an impairment or combination of impairments that met or medically equaled the severity of a listed impairment (AR 25-27), and had the residual functional capacity ("RFC")[2] to perform light work[3] with the following limitations: lifting 20 pounds occasionally and ten pound frequently; occasionally crawling, but no climbing ladders, ropes or scaffolds; no forceful pushing or pulling, forceful gripping or grasping, torquing, repetitive gripping, or prolonged fine manipulation with the right upper extremity; frequent, but not constant, gross and fine manipulation; no work around unprotected heights and dangerous or fast-moving machinery; no responsibility for safety operations with others; no exposure to high-production quota or rapid assembly line work; and capable of completing moderately complex tasks. (AR 27-33). After finding that Plaintiff was able to perform her past relevant work as an order clerk as actually and generally performed, the ALJ found that Plaintiff was not disabled within the meaning of the Social Security Act. (AR 34).

Plaintiff requested that the Appeals Council review the ALJ's decision. (AR 17-18). The request was denied on May 19, 2014. (AR 1-5). The ALJ's decision then became the final decision of the

---

[2]    A Residual Functional Capacity is what a claimant can still do despite existing exertional and nonexertional limitations. See 20 C.F.R. § 404.1545(a)(1).

[3]    "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. §§ 404.1567(b) and 416.967(b).

Commissioner, allowing this Court to review the decision.  <u>See</u> 42 U.S.C. §§ 405(g); 1383(c).

**PLAINTIFF'S CONTENTIONS**

Although Plaintiff has not alleged specific claims of error, it appears, liberally construing Plaintiff's allegations, that Plaintiff is contending that the ALJ erred in failing to properly: (1) assess Plaintiff's credibility; (2) assess the opinion of Plaintiff's treating physician; and (3) determine Plaintiff's RFC. (<u>See</u> Motion at 1-22; <u>see also</u> AR 201-06 [Brief submitted by Plaintiff's counsel to the Appeals Council]; Cross-Motion at 1-16).

**DISCUSSION**

After consideration of the record as a whole, the Court finds that the Commissioner's findings are supported by substantial evidence and are free from material[4] legal error.

**A.   The ALJ Properly Assessed Plaintiff's Credibility**

At the hearing, Plaintiff testified as follows:

She was born in Mexico, but she is now a citizen of the United States (she cannot remember how old she was when she became a citizen).  She has four children (a 35 year-old daughter, a 27 or 28-year old daughter, a 12 year-old son, and a 9 year-old daughter).  She lives with her husband, her 12

---

[4]  The harmless error rule applies to the review of administrative decisions regarding disability.  <u>See</u> <u>McLeod v. Astrue</u>, 640 F.3d 881, 886-88 (9th Cir. 2011); <u>Burch v. Barnhart</u>, 400 F.3d 676, 679 (9th Cir. 2005) (an ALJ's decision will not be reversed for errors that are harmless).

year-old son, 9 year-old daughter, her 35 year-old daughter, and that daughter's 16 year-old daughter.  She took one year of high school level vocational classes in bookkeeping (but did not graduate).  She has attended classes for English as a second language in the United States.  (See AR 45-49, 51-52).

She last worked in 2005.  She received disability insurance from workers' compensation (she did not remember for how long she received it) and workers' compensation for years (she did not remember how many years).  Her workers' compensation case is still pending. (See AR 50-51).

She is not able to work because of pain in her hand, arm, stomach (constipation), back, head (headaches), and her whole body sometimes.  She has headaches 5 or 6 times a week (sometimes lasting for days) and takes aspirin, Tylenol or NyQuil for them.  Since 2005, she has taken medication, mostly the same ones (except for medication for her headaches, stomach and pain).  She hurts even with the medication (and then takes NyQuil or aspirin or whatever she thinks will help her).  The pain makes it difficult for her to focus and concentrate.  (See AR 52-53, 65-66).


She has difficulty reaching and handling things with her right arm.  She cannot hold onto things (she drops them) because her hand shakes and is weak.  She does not have any strength in her right thumb (a "trigger finger").  She has difficulty using her right hand every day; nothing, including the prescribed medication, helps her with the pain.  She has pain in her right shoulder or elbow; the pain radiates to the top of her neck.  She has difficulty lifting and carrying items.  She does not know how much weight she can lift, since she lifts most items with her left (non-dominant) hand.  Her doctor told her to stretch or to continue moving her right hand. (See AR 45, 61-63).

She has not walked for approximately four months, because she feels tired, has headaches and stomach problems, and does not feel like doing anything.  When she does walk, she walks one to two days a week for approximately two to three miles. (See AR 54-55).

The problem with her hand affects her activities of daily living.  She has difficulty dressing, brushing her hair, and doing things in the kitchen, and she has to ask her family members for assistance.  Her husband does the laundry.  She goes grocery shopping with her husband, but she tries to do it with her left hand.  She can walk to the grocery store for a small item.  She picks up a little in the house.  She drives

locally, to pick up her children from school, to the pharmacy, and to the grocery store. The most she drives is about 25 minutes to the church. She tries not to drive far because of her medication, and some days (and sometimes for a week) her pain prevents her from leaving the house. When she cannot drive or take care of her children, her sister-in-law helps her with her children (one or two times a week), and her husband helps her with her children (one or two times a week). (See AR 63-64, 68-69).

Most of her day (from the time she takes her children to school until the time she picks her children up from school) is spent lying down and sleeping. She is not able to sleep through the night; she wakes up many times because of the pain and/or her worries about her dying, her health, and her family. She cries all the time, feeling like she is not a good mother. (See AR 67-68).

She has seen four mental health professional for a diagnosis. The first person, through a program at work, told her to go to workers' compensation (which she did). Then her doctor (who she sees every month) requested a mental health professional for her, but she never saw one. She is depressed. (See AR 53-54, 65).

In an undated Disability Report - Adult, Plaintiff stated that her ability to work is limited by carpal tunnel, chronic pain, depression, and fibromyalgia. (See AR 157).

Plaintiff made the following statements in an undated "Disability Report - Appeal:

(1) her condition has worsened since November 18, 2010; (2) her new limitations are insomnia, attention deficit, constipation, stomach pain, and heavy medication (preventing her from daily functions such as drawing, thinking, talking, domestic duties, and making her suffer emotional highs and lows); (3) her new conditions are stiffness, pain, loss of movement, and inability to straighten thumb; and (4) her new conditions have affected her ability to care for her personal hygiene, and have caused her to feel mentally exhausted and lack short memory.

(See AR 170-75).

After summarizing Plaintiff's hearing testimony (see AR 28), the ALJ wrote:

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.
>
> In terms of the claimant's alleged inability to do work due to adjustment reaction with depressive symptoms; chronic pain syndrome; status post right carpal tunnel release; and fibromyalgia, the record does not contain evidence which shows the claimant is functionally unable to work.

(AR 28).

After discussing the medical evidence in the record, the ALJ wrote:

> In evaluating the claimant's subjective complaints of right upper extremity pain, fatigue, and alleged mental impairment under the factors at 20 CFR 404.1529 and Social Security Ruling 96-7p, the undersigned notes that the claimant's treatment has been conservative in nature and not the type one would expect from a disabling condition; the record does not contain evidence that the claimant's medications caused adverse side effects that would preclude sustained work activity; the record does not provide significant abnormal findings on examination and diagnostic workup to support her alleged disabling condition; the record contains evidence of mental status examinations that revealed few abnormal findings and little evidence of cognitive impairment; the records contains no records of psychiatric treatment during the period under adjudication (except for one month in September 2005); and the claimant has not had any psychiatric hospitalizations.
>
> Moreover, the claimant describes an active life that includes an ability to perform some activity that does not require significant use of the right upper extremity. The claimant testified that she is able to drive, go shopping, and

pick-up the house a little. The record also showed the claimant walks for 15-60 minutes with her sister in law or a friend, and she was able to drive alone for 50 minutes (claimant drove herself [to] a psychiatric evaluation), take long sponge baths, prepare breakfast for her children, help her children get ready for school, and drive her children to school (Exhibit 14F/15). The evidence is inconsistent with limitations that would preclude sustained work activity, and is consistent with an ability to do less than a wide range of light work activity.

The undersigned notes that the record is sparse in terms of evidence to support the claimant's alleged disabling mental impairment. On February 19, 2010, Dr. Freeman reported that the claimant sought psychiatric treatment in August or September 2005 for one month (Exhibit 14F/26). The medical expert, Joseph Malancharuvil, M.D., testified that thereafter the claimant did not seek any formal psychiatric treatment, but did have psychiatric evaluation and testing in September 2009 and February 2010.

Also, in evaluating the claimant's subjective complaints, there is evidence that the claimant exhibited malingering while being examined. On September 3, 2010, Kaiser records note that the claimant had 4/5 strength of the right shoulder due to poor effort and also had 5/5 motor strength on external rotation without pain (Exhibit 21F/66-67). This calls into question the reliability of the claimant's expressed symptoms.

* * * * *

In sum, the above residual functional capacity assessment is supported by the record, when considered as a whole, and especially in light of the paucity of clinic deficit noted upon physical examinations and diagnostic studies, the relatively conservative treatment throughout the period under adjudication, her lack of reported significant adverse side effects from medications, the lack of records limiting the claimant's physical activities, and the claimant's own description of her daily activities. And the record showed that the claimant lacked credibility on several issues and it is therefore highly suggestive that the claimant exaggerated her symptoms, and therefore was not found to be an entirely credible witness. . . .

(AR 30-33).

8

A claimant initially must produce objective medical evidence establishing a medical impairment reasonably likely to be the cause of the subjective symptoms. Smolen v. Chater, 80 F.3d 1273, 1281 (9th Cir. 1996); Bunnell v. Sullivan, 947 F.2d 341, 345 (9th Cir. 1991). Once a claimant produces objective medical evidence of an underlying impairment that could reasonably be expected to produce the pain or other symptoms alleged, and there is no evidence of malingering, the ALJ may reject the claimant's testimony regarding the severity of her pain and symptoms only by articulating specific, clear and convincing reasons for doing so. Brown-Hunter v. Colvin, 798 F.3d 749, 755 (9th Cir. 2015)(citing Lingenfelter v. Astrue, 504 F.3d 1028, 1036 (9th Cir. 2007)); see also Smolen v. Chater, supra; Reddick v. Chater, 157 F.3d 715, 722 (9th Cir. 1998); Light v. Social Sec. Admin., 119 F.3d 789, 792 (9th Cir. 1997).[5]

---

[5]    The ALJ stated that "there is evidence that the claimant exhibited malingering while being examined" based on Kaiser Permanente records dated September 3, 2010 which "note that the claimant had 4/5 strength of the right shoulder due to poor effort and also had 5/5 motor strength on external rotation without pain" (AR 31, citing AR 978-79). However, since the notations in those records do not constitute affirmative evidence of malingering -- meaning, pretending to be sick or injured in order to avoid doing work, see www.merrian-webster.com/dictionary/malinger -- the clear and convincing standard applies to this case. See Carmickle v. Commissioner, 533 F.3d 1155, 1160 (9th Cir. 2008) ("The only time this [clear and convincing] standard does not apply is when there is affirmative evidence that the claimant is malingering."); Lester v. Chater, 81 F.3d 821, 834 (9th Cir. 1995)(as amended) ("Unless there is affirmative evidence showing that the claimant is malingering, the Commissioner's reasons for rejecting the claimant's testimony must be 'clear and convincing.'")(citation omitted).

Here, substantial evidence supports the ALJ's finding that Plaintiff's testimony about the intensity, persistence and limiting effects of her symptoms was not fully credible.

The ALJ properly discredited Plaintiff's testimony about her limitations because it was not supported by the objective medical evidence. See Burch v. Barnhart, 400 F.3d 676, 681 (9th Cir. 2005) ("Although lack of medical evidence cannot form the sole basis for discounting pain testimony, it is a factor that the ALJ can consider in his credibility analysis); Rollins v. Massanari, 261 F.3d 853, 857 (9th Cir. 2001) ("While subjective pain testimony cannot be rejected on the sole ground that it is not fully corroborated by objective medical evidence, the medical evidence is still a relevant factor in determining the severity of the claimant's pain and its disabling effects); Morgan v. Commissioner, 169 F.3d 595, 599-60 (9th Cir. 1999).

The ALJ properly found that "[p]hysical examinations during the period under adjudication showed abnormalities of the right upper extremity, but were otherwise generally unremarkable" (AR 28). See Burch v. Barnhart, supra, 400 F.3d at 679 ("Where evidence is susceptible to more than one rational interpretation, it is the ALJ's conclusion that must be upheld."). That finding was supported by the following evidence which the ALJ discussed (see AR 24-25, 28-29):

///

///

September 6, 2005 Report

A September 6, 2005 report prepared by Ronald D. Levin, M.D. revealed: (a) an electromyogram performed on Plaintiff's upper extremities showed: "[r]ight median neuropathy, distal, severe, incomplete (compatible with right carpal tunnel syndrome);" (b) a nerve conduction study on both ulnar nerves "reveal[ed] no delay in motor and sensory conduction" and motor nerve conduction velocity within normal limits; (c) a nerve conduction study on both median nerves "revealed the only abnormality to be severe reduction of the amplitude of the motor unit potential of the right median nerve, proximately" at "about a 75% reduction;" and (d) a nerve conduction study of the bilateral superficial radial nerves "reveals no delay in sensory conduits across the wrists." (See AR 289-92);

October 6, 2005 Examination

An October 6, 2005 examination performed by James D. Matiko, M.D., at Arrowhead Orthopaedics, diagnosed Plaintiff with mild right elbow medial epicondylitis, status post right open carpel tunnel releases X3, and chronic recurrent right carpet tunnel syndrom, finding, inter alia, "Active neck range of motion is full, fluid, symmetric and painless;" "Active elbow range of motion, including pronation and supination, are full, fluid, and painless;" "Active wrist range of motion is full, fluid, and painless;" "The tip of the thumb actively touches the fifth metacarpal head.  Thumb adduction, radial abduction, and opposition are normal.  The tips of the ulnar four digits actively flex to midpalmer

crease.  All digits can fully extend actively;" "All extrinsic hand tendons are in continuity;" "There is no crepitus or abnormal sound with active or passive motion;" "The patient is tender when palpating over the medial epicondyle of the elbow;" "There is no other tenderness, swelling, atrophy, or palpable abnormality;" "Light touch is intact over dermatomes C5 through T1.  Light touch is intact over the distribution of the superficial branch of the radial nerve, palmar cutaneous branch of the medial nerve, and dorsal cutaneous branch of the ulnar nerve.  Semmes-Weinstein monofilament sensory testing is normal at 2.83 on the volar aspect of all digits.  Strength in myotomes C5 through T1 is grade 5/5;" "The biceps, brachioradialis, and triceps tendon reflexes are normoactive.  Radial and ulnar pulses are palpable and there is brisk digital capillar refill;" "Foraminal compression testing for cervical radiculopathy is negative. . . .  There is no ulnar nerve instability at the elbow and the passive elbow flexion and percussion tests are negative for cubital tunnel syndrome.  The Phalen and carpal compression tests are positive for carpal tunnel syndrome.  The percussion test is negative for carpal tunnel syndrome;" "Testing for specific elbow tendonitis, instability, and arthritis is negative;" "Testing for specific wrist and hand tendonitis, including flexor carpi radialis and extensor carpi ulneris tendonitis, intersection syndrome, de Quervain's disease and trigger finger is negative;" "Testing for distal radioulner instability and arthritis, torn triangular fibrocartilage, and carpal instability and arthritis is negative;" "Testing for carpometacarpal, metacapophalangeal, and interphalangeal instability and arthritis is

negative;" and "The remaining upper extremity examination is within normal limits." (See AR 297-99);

March 8, 2006 Examination

A March 8, 2006 examination(following repeat right carpal tunnel release surgery in December) by Dr. Matiko at Arrowhead Orthopaedics, contained most of the same findings as Dr. Matiko's October 6, 2005 examination, with the following additional findings: "There is tenderness over the medical epicondyle of the elbow. There is tenderness over the previously noted surgical scar in the palm;" "There is no other tenderness, swelling, atrophy, or palpable abnormality;" "Static two-point sensory discrimination is normal at 6mm on the volar aspect of all digits. Strength in myotomes C6 through T1 is grade 5/5. Radial, median, and ulnar nerve motor function is grossly intact. Thumb opposition (palmar abduction) strength is grade 4/5 on the right, 5/5 on the left;" and "Testing for cervical radiculopathy and brachial plexopathy, including thoracic outlet syndrome, is negative. . . . The pronator compression and percussion tests are negative for proximal forearm median nerve entrapment. The carpal compression, Phalen, and percussion tests are negative for carpal tunnel syndrome. The carpal compression and percussion tests are negative for Guyon's canal syndrome." (See AR 329-30);

///

///

///

13

<u>October 19, 2006 Examination</u>

An October 19, 2006 examination performed by John L. Beck, M.D., at Healthpointe Medical Group, Inc., finding, <u>inter alia</u>, "There is no evidence of loss of range of motion as the patient turns, flexes and extends the head during examination. There is no complaint of any trapezial spasms. The patient moves the neck well with no complaint of numbness into the hands related to neck motion. There is no complaint of painful clicking or catching in the cervical spine;" Plaintiff's range of motion of the cervical spine with respect to flexion, extension, right/left lateral bending and right/left rotation is normal; "There is mild tenderness over the anterior aspect of the right shoulder. Otherwise, in general there is good motion in the shoulders with flexion, extension and abduction, with pain at extremes of passive range of motion. The patient has not complaints of clicking, catching or instability problems around the shoulder. There is no weakness noted during the examination. No associated complaints of numbness into the hands with shoulder motion;" Plaintiff's range of motion of the shoulders with respect to abduction, adduction, internal rotation, external rotation, extension and flexion is normal. "There is obvious swelling over the medial aspect of the right elbow. The patient is extremely hypersthetic and cannot even tolerate light palpation around the elbow. The majority of her pain does seem to be more on the lateral side of the elbow than on the other side. The tenderness extends down to the mid forearm level. Range of motion is also correspondingly restricted, due to the pain in the elbow, but passively seems to be at

least 80% of normal;" "The left elbow has a well-healed medial scar over the ulnar nerve, with no sensitivity and with normal range of motion;" "Both wrists have bilateral carpal tunnel scars. . . . There is severe sensitivity to pressure over the operated right hand.   Light touch sensation is intact in the fingertips.   There is skin print present on the thumbs and on all fingers.   There is no evidence for intrinsic muscle atrophy in the hands.   Skin color appears to be normal.   The right hand appears to have less sweating than the left hand.   There is diffuse weakness in the right hand.   There is also limitation of complete grip, and the patient has limited abduction and adduction of the fingers;" and grip strength in the right hand is 10/5/5, and grip strength in the left hand is 45/45/30. (See AR 344-45);

May 22, 2007 Examination

A May 22, 2007 examination performed by Dr. Beck at Healthpointe Medical Group, Inc., finding, inter alia, "Examination of the cervical spine reveals no gross tenderness of the posterior neck muscles or any specific trigger points noticeable.   There is no evidence of any tenderness anteriorily and no noticeable swollen glands. . . .   There is no weakness noted of the neck musculature.   Gross muscle strength testing is noted to be normal about the neck.   There is mild increased tenderness in the lateral cervical muscles, without specific localization.   There is mild tenderness over the right sternoclavicular joint, but no deformity or swelling;" Plaintiff's range of motion of the cervical spine with respect to flexion, extension, right/left lateral

bending and right/left rotation is normal; "Examination of the left shoulder reveals that in general, there is good motion . . . with flexion, extension and abduction.  The patient has no complaints of clicking, catching or instability problems around the shoulder.  There is no weakness noted during the examination.  No associated complaints of numbness into the hand with shoulder motion;" "Examination of the right shoulder demonstrates no atrophy, fasciculations, swelling, or discoloration.   There is diffuse, nonspecific tenderness of a mild degree over the anterior shoulder.  Range of motion is restricted due to the severe pain in the right upper extremity;" "There is full passive range of motion of the left elbow.  The patient is noted to move the elbow freely with flexion, extension, supination, and pronation and without pain.  There are no complaints of tenderness or pain around the epicondylar regions;" "On the right side [elbow], range of motion is restricted due to pain.  The medial aspect of the elbow appears to be mildly swollen and very hyperesthetic to even the lightest touch.  Basically, the patient will not let me palpate the right elbow.  Range of motion cannot be effectively evaluated due to guarding;" "Examination of the left wrist/hand reveals full motion of the hand with the fingers coming down to the mid palmar crease fully;" "On the right hand, the patient sits with her hand in a guarded, palm up position.  Close inspection does not reveal significant color difference but does indicate some dryness of the skin, compared to the left hand. . . .  The radial artery and ulnar artery pulses are present to light palpation.  The patient is unable to perform vascular challenge (Allen's test).  She

can voluntarily close her fingertips to within 1 cm of the distal palmer flexion crease in the palm, but she does this very slowly and carefully. She cannot completely close her grip.  In attempting thumb to base of little finger, she clears the base of the little finger by 1.5 cm.  She clears the tip of the little finger by approximately 6 mm;" "Capillary rebound in the fingertips appears to be sluggish.  The patient demonstrates limited active abduction of her thumb and abduction of her digits when asked to spread her fingers;" "Sensory evaluation is limited by hyperesthesis, but she alleges numbness in her little finger primarily;" Plaintiff was not able to cooperate on right hand grip strength testing; and Plaintiff's left hand grip strength is 25/25/30 (but the examiner opined her scores were "subnormal for a middle-aged female"). (See AR 363-65);

February 13, 2008 Examination

A February 13, 2008 examination performed by Albert Simpkins, Jr., M.D., at West Coast Orthopedics, finding, inter alia, normal range of motion and no tenderness to palpation of the cervical and thoracic spine; normal range of motion and no gross deformities of both shoulders and diffuse tenderness to palpation of the right shoulder; normal range of motion, no gross abnormalities and no swelling of both elbows and diffuse tenderness to palpation of the right elbow (but negative Tinel's sign at the cubital tunnel, no pain with resisted wrist dorsiflexion, and negative hyperflexion testing); normal range of motion, no gross abnormalities no swelling, and no thenar or hypothenar wasting of both

17

wrists, tenderness to palpation of the flexor aspect of the right wrist (with a positive Phalen's sign on the right wrist but negative Phalen's sign on the right wrist, and negative Tinel's sign and Finkelstein tests on both wrists), and the ability to make a complete fist; equal and active deep tendon reflexes of the biceps, triceps and brachioradialis, negative clonus and Hoffman signs, intact sensation testing with no hypesthesia, normal muscle testing, and no weakness; a right wrist grip strength of 0/0/0 and a left wrist grip strength of 18/18/17. (See AR 463-66);

2008-2010 Examinations

Reports of examinations from March 5, 2008 to August 27, 2010 (pain management) at Sonora Medical Group, Inc., finding, inter alia, that Plaintiff had decreased spontaneous use of the right upper extremity, generalized weakness throughout the right upper extremity, decreased right hand grip strength, and generalized tenderness through the right shoulder, arm, elbow, wrist and hand. (See AR 375-76, 381-82, 387-88, 392-93, 397-98, 404-05, 415-16, 427-28, 435, 453-54, 1108-09, 1112-13, 1117-18, 1121-22, 1126-27, 1130-31, 1136-37, 1146-47, 1158-59, 1167-68, 1179-80, 1187-88, 1195-96, 1199-1200, 1203-04, 1207-09, 1217-18, 1232-33, 1243-44, 1248-58);

November 5, 2009

A November 5, 2009 examination (rheumotology) performed by Rodney Bluestone, M.B., at Rodney Bluestone Medical Corporation, finding, inter

18

<u>alia</u>, a full and painless range of motion of the cervical spine; 30% off full range of motion of the right shoulder, accompanied by joint discomfort to slight pain (but almost full range of motion without an increase in discomfort with a passive assist); full and painless range of motion of the right elbow; full and painless range of motion (with a negative Phalen's test) of the right wrist; no discoloration, synovitis or myopathy of the right hand; right hand grip strength 15/15/15 (against an expected 55 pounds of force), and left hand grip strength 35/40/40 (against an expected 49 pounds of force); mild tenderness over the right trapezial area, the right rhomboid region, and several distal interphalangeal joints (although Plaintiff said she did not like even light contact on the right upper arm); and no other abnormal physical signs. (<u>see</u> AR 538-49); and

    <u>August 5, 2010 X-Ray</u>

    An August 5, 2010 X-ray of the bilateral shoulders, revealing: a mild narrowing at the acromioclavicular joint of the right shoulder with a small calcific density and no acute bony abnormalities; and a narrowing of the acromioclavicular joint of the left shoulder with a few tiny densities and no evidence of acute fracture or dislocation. (<u>see</u> AR 931-32).

    As the ALJ noted, treatment records from the Medical Center for Bone and Joint Disorders [Scott Goldman, M.D.] (where Plaintiff was treated from February 4, 2004 through December 20, 2010) "did not

provide significant findings on examination, but did report sign[s] of tenderness and generalized pain in the right upper extremity, as well as positive Tinel's sign and Phalen's sign findings of the right upper extremity." (AR 29).[6]

Although the ALJ apparently was focused on the treatment records prior to December 31, 2010 (the date last insured), Plaintiff was treated at the Medical Center for Bone and Joint Disorders through April 20, 2012, according to Dr. Goldman, see AR 1600). However, the treatment records after December 31, 2010 reflect essentially the same findings as the earlier treatment records. (See AR 888, 1524-25

---

[6]   (See AR 799, 846 [February 4, 2004], 786 [January 25, 2005], 847 [February 2, 2005], 784 [March 2, 2005], 794 [March 30, 2005], 838 [April 27, 2005], 781, 783 [May 23, 2005], 789 [June 20, 2005], 792 [June 28, 2005], 818 [July 18, 2005], 812 [August 12, 2005], 842 [August 26, 2005], 790 [September 23, 2005], 798 [October 21, 2005], 828 [November 16, 2005], 802 [December 15, 2005], 797 [January 13, 2006], 819 [February 13, 2006], 776 [March 15, 2006], 811 [April 5, 2006], 777 [May 4, 2006], 833 [June 6, 2006], 793 [July 3, 2006], 824 [August 11, 2006], 844 [September 22, 2006], 836 [November 2, 2006], 835 [December 14, 2006], 841 [January 25, 2007], 785 [March 8, 2007], 805 [April 19, 2007], 814 [May 31, 2007], 820 [July 10, 2007], 796 [August 7, 2007], 806 [September 18, 2007], 778 [October 30, 2007], 834 [November 28, 2007], 810 [January 10, 2008], 826 [February 21, 2008], 788 [March 20, 2008], 848 [April 30, 2008], 815 [June 11, 2008], 804 [July 14, 2008], 849 [August 12, 2008], 823 [September 9, 2008], 774 [October 9, 2008], 839 [November 6, 2008], 845 [December 8, 2008], 795 [January 7, 2009], 827 [February 5, 2009], 787 [March 10, 2009], 837 [April 9, 2009], 809 [May 7, 2009], 780 [June 9, 2009], 808 [July 15, 2009], 829 [August 17, 2009], 803 [September 15, 2009], 832 [October 13, 2009], 831 [November 12, 2009], 830 [January 4, 2010], 840 [February 1, 2010], 816 [March 5, 2010], 817 [April 8, 2010], 775 [May 6, 2010], 801 [July 21, 2010], 821 [October 22, 2010], 779 [November 19, 2010], 800 [December 10, 2010] and 825 [December 20, 2010]; see also AR 1443-1523 [Progress Notes dated May 7, 2009, June 9, 2009, July 15, 2009, August 17, 2009, September 15, 2009, October 13, 2009, November 12, 2009, December 10, 2009, January 4, 2010, February 1, 2010, March 5, 2010, April 8, 2010, May 6, 2010, July 21, 2010, October 22, 2010, November 19, 2010, and December 20, 2010).

[January 19, 2011], 887, 1536-37 [February 21, 2011], 886, 1543-44 [March 23, 2011], 885, 1547-48 [April 25, 2011], 1551-52 [May 23, 2011],1555-56 [June 21, 2011], 1571-72 [July 21, 2011], 1579-80 [August 26, 2011], 1559-60 [September 27, 2011], 1588-89 [October 25, 2011]).

The ALJ also noted that treatment records from Kaiser Permanente (where Plaintiff was treated from June 29, 2010 to May 5, 2011) "appeared to show some improvement [in her] upper extremity symptoms" (AR 29). (See AR 915-18 [June 29, 2010, noting a normal neck, cardiovascular, pulmonary/chest, abdominal, musculoskeletal and neurological examination], 925-26 [August 5, 2010, stating that Plaintiff was complaining of pain in her shoulders, and noting normal neck, cardiovascular, pulmonary/chest, abdominal, musculosketal ("Normal range of motion. She exhibits tenderness.")], 963-67 [August 27, 2010, noting a normal neck, cardiovascular, pulmonary/chest, abdominal, musculoskeletal, and neurological examination], 977-79 [September 3, 2010, stating that Plaintiff was complaining of increasing bilateral shoulder pain; finding that Plaintiff exhibited tenderness and pain but showed a normal range of motion, no swelling, effusion, crepitus, deformity, laceration or spasm, and normal pulse and strength; and finding (based on a bilateral shoulder exam), inter alia, that Plaintiff had some atrophy in the right shoulder, full range of motion (except the internal rotation was with pain), 4/5 strength (based on poor effort bilaterally), and 5/5 strength on external rotation and internal rotation without pain], 986-87 [September 17, 2010, noting a normal

21

neck, cardiovascular, pulmonary/chest, abdominal, musculoskeletal, and neurological examination], and 997-99 [May 5, 2011, noting a normal neck, cardiovascular, pulmonary/chest, abdominal, musculoskeletal, and neurological examination].

The ALJ properly found that "[m]ental examinations were generally unremarkable with few abnormal findings" (AR 30). That finding was supported by the following evidence discussed by the ALJ (see id.):

July 20, 2005 Assessment

A July 20, 2005 Employee Support Systems Intake Assessment, finding that Plaintiff had a depressed mood, but was oriented, dressed appropriately, and had intact though processes. (See AR 231);

September 29, 2009 Psychiatric Examination

A psychiatric examination performed by Esther Liba Chodakiewitz, M.D., at Inland Empire Psychiatric Care, Inc., on September 29, 2009 finding, inter alia, that Plaintiff appeared to be unhappy, inhibited and hopeless, and disinterested in social appearance, but was cooperative, attentive and interested during the examination; Plaintiff's speech was monotonous, soft, low-pitched and slow, but there were no disturbances in her speech; Plaintiff's affect was flat and her face was immobile; there were no hallucinations, illusions, depersonalization or derealization; Plaintiff's thought process was goal-directed and relevant and there was not distractibility or language

impairment; Plaintiff was mainly preoccupied about her illness, finances, family responsibilities, competency for work and the future (she had paranoid, and possibly somatic, delusions), and was capable of abstract thinking; Plaintiff was alert and oriented, and had intact memory; Plaintiff had fair judgment and insight; and Plaintiff was not reliable or capable of reporting her situation accurately - "she is confused with dates about important events." (See AR 525-26); and

### February 19, 2010 Psychological Examination

A February 19, 2010 psychological examination performed by David Freeman, Ph.D. and Susan C. Rose, Ph.D. at Cal Psych FMT, finding, inter alia, that Plaintiff was cooperative and cordial during the examination; responded thoughtfully to the questions, although her responses seemed somewhat controlled; Plaintiff's speech was normal; Plaintiff presented the facts of her case rationally; Plaintiff's affect was mildly to moderately dysphoric with tearfulness (based on feelings of sadness, worthlessness and anxiety); Plaintiff was oriented; there was no evidence of homicidal or suicidal ideation, pressured speech, loose associations, ideas of reference, or auditory or visual hallucinations; Plaintiff was of average intelligence, with a fund of knowledge commensurate with education and background; Plaintiff's judgment and insight were fair; Plaintiff's long-term memory was somewhat impressionistic (she was unclear about specific dates and details of her history), but she was able to give a reasonably fair accounting of her life events; and Plaintiff had impaired concentration and short-term

memory, but not severe enough to interfere with normal functioning (see AR 662-64).

The ALJ's finding that there was sparse evidence concerning Plaintiff's mental impairment was also a clear and convincing reason for partially discrediting Plaintiff's testimony. See Burch v. Barnhart, supra ("The ALJ is permitted to consider lack of treatment in his credibility determination."); Bunnell v. Sulivan, 947 F.2d 341, 346 ((th Cir. 1991) ("Another relevant factor [in a credibility determination may be 'unexplained, or inadequately explained, failure to seek treatment or follow a prescribed course of treatment.'"). As the ALJ noted, (see AR 31), at the February 19, 2010 psychological examination, Plaintiff reported that she sought psychiatric treatment in August or September 2005 for only about one month (see AR 680), and at the hearing the psychological expert (Dr. Malancharuvil) testified that Plaintiff sought mental health treatment for one month in 2005, did not seek any mental health treatment prior to the psychiatric evaluation in December 2009, and did not seek any mental health treatment prior to or after the psychological evaluation in February 2010 (see AR 58).

Moreover, the ALJ's finding that, during a September 3, 2010 bilateral shoulder strength examination, Plaintiff gave "poor effort" but was able to do external rotation and external rotation without pain (AR 31, citing AR 978) was a clear and convincing reason for partially discrediting Plaintiff's testimony regarding her symptoms. See Thomas

24

v. Barnhart, 278 F.3d 947, 959 (9th Cir. 2002)(claimant's "efforts to impede accurate testing of her limitations", namely, her failure to give maximum or consistent effort during two physical capacity evaluations, "supports the ALJ's determinations as to her lack of credibility").

In addition, the ALJ's finding that Plaintiff's abilities to perform certain daily activities not requiring significant use of her upper right extremity, such as driving, shopping, picking up the house a little, walking 15 to 60 minutes with her sister-in-law or a friend, driving alone for as long as 50 minutes, taking long sponge baths, preparing breakfast, helping her children get ready for school, and driving her children to school (see AR 54, 64, 662, 669), undermined her credibility concerning her functional limitations because "such evidence is inconsistent with limitations that would preclude sustained work activity and is consistent with an ability to do less than a wide range of light work activity" (AR 30), was a clear and convincing reason for partially discrediting Plaintiff's testimony. See Rollins v. Massanari, 261 F.3d 853, 857 (9th Cir. 2001); Bunnell v. Sullivan, supra, 947 F.2d at 345-46; see also Morgan v. Commissioner of Social Sec. Admin., 169 F.3d 595, 600 (9th Cir. 1999)("If a claimant is able to spend a substantial part of his day engaged in pursuits involving the performance of physical functions that are transferable to a work setting, a specific finding as to this fact may be sufficient to discredit a claimant's allegations."); Reddick v. Chater, supra ("Only if the level of activity were inconsistent with the Claimant's claimed

limitations would these activities have any bearing on Claimant's credibility.").[7]

**B.   The ALJ Properly Rejected the Opinion of Plaintiff's Treating Physician, Scott Goldman, M.D.**

Although a treating physician's opinion is generally afforded the greatest weight in disability cases, it is not binding on an ALJ with respect to the existence of an impairment or the ultimate determination of disability. Batson v. Comm'r of Soc. Sec. Admin., 359 F.3d 1190, 1195 (9th Cir. 2004); Magallanes v. Bowen, 812 F.2d 747, 751 (9th Cir. 1989).   The weight given a treating physician's opinion depends on whether it is supported by sufficient medical data and is consistent with other evidence in the record.   20 C.F.R. § 416.927(b)-(d).   If a treating doctor's opinion is not contradicted by another doctor, the ALJ can reject the treating doctor's opinion only for "clear and convincing reasons."   Carmickle v. Commissioner, 533 F.3d 1155, 1164 (9th Cir. 2008); Lester v. Chater, supra, 81 F.3d at 830.   If the treating

---

[7]     Even if the ALJ erred in discrediting Plaintiff's testimony based on her ability to perform daily activities, see Vertigan v. Halter, 260 F.3d 1044, 1050 (9th Cir. 2001)("[T]he mere fact that a plaintiff has carried on certain daily activities . . . does not in any way detract from her credibility as to her overall disability.  One does not need to be 'utterly incapacitated' in order to be disabled."), the Court finds any such error to be harmless since, as discussed above, the ALJ provided other clear and convincing reasons for partially rejecting Plaintiff's testimony about her symptoms and limitations.  See Carmickle v. Commissioner, 533 F.3d 1155, 1162-63 (9th Cir. 2008)("So long as there remains 'substantial evidence supporting the ALJ's conclusion on . . . credibility' and the error 'does not negate the validity of the ALJ's ultimate [credibility] conclusion,' such is deemed harmless and does not warrant reversal.")(citation omitted); Tommasetti v. Astrue, 533 F.3d 1035, 1038 (9th Cir. 2008) (an ALJ's error is harmless "when it is clear from the record . . . that it was 'inconsequential to the ultimate nondisability determination.'").

doctor's opinion is contradicted by another doctor, the ALJ must provide "specific and legitimate reasons" for rejecting the treating doctor's opinion. Orn v. Astrue, 495 F.3d 625, 632 (9th Cir. 2007l); Reddick v. Chater, supra, 157 F.3d at 725; Lester v. Chater, supra.

Scott Goldman, M.D., a Board certified orthopedic surgeon, treated Plaintiff from February 4, 2004 to April 20, 2012. (See AR 774-849, 885-97, 902-12, 1443-1532, 1535-86, 1588-91, 1600).[8]   In an Upper Extremity Impairment Questionnaire dated April 20, 2012, Dr. Goldman diagnosed Plaintiff with right elbow cubital tunnel syndrome, right wrist carpal tunnel syndrome, "CRPS/RSO right upper extremity," right thumb trigger finger, constipation secondary to opiod use and depression, supported by the following clinical findings: reduced grip strength, tenderness, swelling, loss of sensation, and loss of fine coordination of the upper right extremity, and decreased sensation to the fingertips of the right hand. (AR 1600-01). Dr. Golman opined that Plaintiff had the following functional limitations:  can lift and carry up to 5 pounds occasionally but never more than 5 pounds; cannot keep her neck in a constant position (i.e., looking at a computer screen or looking down at the desk), preventing her from doing a full-time competitive job requiring that activity on a sustained basis; had significant limitations in repetitive reaching, handling, fingering or lifting -- with respect to her upper right extremity, marked limitations

---

[8]     Although Dr. Goldman states he began treating Plaintiff on January 5, 2005 (see AR 1600), it appears Dr. Goldman began treating Plaintiff as early as February 4, 2004. (See  AR 799, 846).

in grasping/turning/twisting objects, using fingers/hands for fine manipulations, and using arms for reaching -- and with respect to her left upper extremity, minimal limitations in those areas; significant repetitive reaching, handling or fingering increase her symptomatology and pain; other limitations affecting her ability to work at a regular job on a sustained basis are psychological limitations, the need to avoid wetness, temperature extremes, fumes, gases, humidity and heights, and no pushing or pulling; anxiety and depression contribute to her pain and lack of mobility; every 30 minutes during an 8-hour workday she will need to take unscheduled breaks lasting 30 to 45 minutes; and she would likely be absent from work more than 3 times a month as a result of her impairments.  (See AR 1600-05).


The ALJ addressed Dr. Goldman's opinion as follows:

> A treating physician's medical opinion, on the issue of the nature and severity of an impairment, is entitled to special significance; and, when supported by objective medical evidence and consistent with otherwise substantial evidence of record, entitled to controlling weight (Social Security Ruling 96-20).  However, the undersigned, pursuant to 20 CFR § 404.1527 and Social Security Ruling 96-2p, finds no support in the findings reported by Dr. Goldman.  Some weight is given to the right upper extremity limitations imposed by Dr. Goldman, [but] the physical examination findings throughout the record do not support the extent of limitations found by Dr. Goldman.  In addition, Dr. Goldman's report primarily summarizes the claimant's subjective complaints and diagnoses but does not present objective clinical or laboratory diagnostic findings that support its conclusions.  Accordingly, the undersigned gives little evidentiary weight to this opinion which, if otherwise accepted as credible, would indicate that the claimant could not perform any kind of work.

(AR 32-33).

The ALJ properly discredited Dr. Goldman's opinion because it was conclusory and not supported by the objective medical evidence. <u>See</u> <u>Thomas v. Barnhart</u>, 278 F.3d 947, 957 (9th Cir. 2002) (An ALJ "need not accept the opinion of any physician, including a treating physician, if that opinion is brief, conclusory and inadequately supported by clinical findings."); <u>Rollins v. Massanari</u>, 261 F.3d 853, 856 (9th Cir. 2001) (ALJ properly discounted treating physician's opinion for being "so extreme as to be implausible" and "not supported by any findings" where there was "no indication in the record what the basis for these restrictions might be"); <u>Magallanes v. Bowen</u>, <u>supra</u>, 881 F.2d at 752 (ALJ's decision to reject the treating physician's opinion due to a lack of medical evidence was sufficiently "specific and legitimate" and based on substantial evidence in the record).

Although Dr. Goldman's examinations of Plaintiff revealed issues with her upper right extremity *prior to* the date last insured -- (<u>see</u> AR 799, 846, 786, 847, 784, 794, 838, 781, 783, 789, 792, 818, 812, 842, 790, 798, 828, 802, 797, 819, 776, 811, 777, 833, 793, 824, 844, 836, 835, 841, 785, 805, 814, 820, 796, 806, 778, 834, 810, 826, 788, 848, 815, 804, 849, 823, 774, 839, 845, 795, 827, 787, 837, 809, 780, 808, 829, 803, 832, 831, 830, 840, 816, 817, 775, 801, 821, 779, 800, 825, 1443-1523)-- and *after* the date last insured (<u>see</u> AR 885-88, 1524-25, 1536-37, 1543-44, 1547-48, 1551-52, 1555-56, 1559-60, 1571-72, 1579-80, 1588-89, those examinations (as well as the other physical examinations and medical evidence discussed above, <u>see</u> AR 297-99, 289-92, 329-30,

344-45, 363-65, 463-66, 375-76, 381-82, 387-88, 392-93, 397-98, 404-05, 415-16, 427-28, 435, 453-54, 538-49, 915-18, 925-26, 931-32, 963-67, 977-79, 986-87, 997-99, 1108-1227, 1232-39, 1243-61) did not provide a basis for Dr. Goldman's overall extremely restrictive limitations (except for the limitations of no forceful pushing or pulling, forceful gripping or grasping, torquing, repetitive gripping, and fine manipulation with the right upper extremity, see AR 27).

Moreover, the ALJ properly rejected Dr. Goldman's opinion based on Dr. Goldman's reliance on Plaintiff's self-reports of symptoms and limitations which the ALJ properly discredited, as discussed above. See Tomasetti v. Astrue, 533 F.3d 1035, 1041 (9th Cir. 2008)("An ALJ may reject a treating physician's opinion if it is based 'to a large extent' on a claimant's self-reports that have been properly discounted as incredible.")(citations omitted).

**C.    The ALJ Properly Determined Plaintiff's RFC**

To the extent that Plaintiff is challenging the ALJ's determination about her RFC based on: (1) findings by Dr. Goldman that she was temporarily totally disabled and then unable to work (see Motion at 3, citing AR 776-858 [Treatment records showing that Dr. Goldman found Plaintiff temporarily totally disabled beginning on February 2, 2005 and then unable to work beginning on October 22, 2010], and (2) findings by Dr. Beck that Plaintiff has a severe disability and is not capable of

any type of useful work (see Motion at 3, citing AR 366-67 [In a report dated May 22, 2007, Dr. Beck, following a physical examination, diagnosed Plaintiff with chronic regional pain syndrome, status post multiple nerve surgeries, and found that Plaintiff was temporarily totally disabled and "cannot at this time return to her usual and customary work"])[9], Plaintiff's claim fails.

Dr. Goldman's and Dr. Beck's findings of temporary total disability and inability to work were specific to Plaintiff's workers' compensation claim and were not binding on the ALJ. See 20 C.F.R. § 404.1504 ("A decision by any nongovernmental or any other governmental agency about whether you are disabled or blind is based on its rules and is not our decision about whether you are disabled or blind. We must make a disability or blindness determination based on social security law. Therefore, a determination made by another agency that you are disabled or blind is not binding on us."); Alvarez v. Colvin, 562 Fed.Appx. 553, 553 (9th Cir. 2014)("Because the ALJ is obliged to make a disability determination based on social security law, the ALJ was not bound by Dr. Larsen's finding that [the claimant] was temporarily totally disabled for purposes of California workers' compensation"); see also 20 C.F.R. § 404.1527(d)(1) ("A statement by a medical source that you are 'disabled' or "unable to work" does not mean that we will determine that you are disabled."). While the ALJ did not specifically mention Dr.

_____

[9]     The Court notes that consultative psychological examiners Drs. Freeman and Rose opined that Plaintiff was temporarily totally psychologically disabled from March 8, 2006 through November 5, 2008. (See AR 758).

31

Goldman's and Dr. Beck's findings of temporary total disability and inability to work, it is clear from the ALJ's Decision that such findings were considered (see AR 28-29, 31 [noting Dr. Malancharvuil's testimony that Plaintiff was found to be temporarily disabled in 2005 and 2009, see AR 56-57)]. See SSR 96-5p, 1996 WL 374183, *3 ("Opinions from any medical source on issues reserved to the Commissioner must never be ignored. The adjudicator is required to evaluate all evidence in the case record that may have a bearing on the determination or decision of disability, including opinions from medical sources about issues reserved to the Commissioner.").

Moreover, contrary to Plaintiff's implied assertion (see Motion at 3), the fact that Dr. Goldman stated on June 21, 2010 that "[f]uture medical care should include medications, repeat injections, including stellate ganglion blocks, diagnostic studies, surgery for the right shoulder, right elbow, right wrist, and pain management" (AR 892) does not mean that the ALJ was required to find Plaintiff disabled. Dr. Goldman's statement about Plaintiff's future medical care was not definitive; Dr. Goldman did not say that all those measures would be absolutely necessary. Nonetheless, the ALJ's determination about Plaintiff's RFC (with the exception of an overhead reaching limitation) includes a majority of the work restrictions assessed by Dr. Goldman in the June 21, 2010 report, such as "forceful pushing and pulling, repetitive gripping and torquing, and prolonged fine manipulation with the right upper extremity" (id.).

To the extent that Plaintiff is contending that the ALJ improperly relied on nonexamining psychological expert, Joseph Malancharuvil, M.D., in determining Plaintiff's RFC, Plaintiff's claim is without merit.

The ALJ gave great weight to Dr. Malancharuvil who opined, based on his review of the entire medical record, including Plaintiff's testimony, that Plaintiff had adjustment reaction with depressive symptoms and chronic pain syndrome; no limitations in her activities of daily living, mild limitations in social functioning, and mild to moderate limitations in concentration, persistence or pace; Plaintiff's impairment or combination of impairments did not equal or meet any Listing; Plaintiff could perform moderately complex tasks; Plaintiff was precluded from operating hazardous or fast-moving machinery, safety-related operations, and highly fast-paced work (such as an assembly line); Plaintiff's limitations would be mostly physical in nature; and Plaintiff's reaction to her physical issues caused her depression (see AR 55-61). (See AR 31-32).

As noted by the ALJ (see AR 32), Dr. Malancharuvil's opinion about Plaintiff's limitations was consistent with: (a) the February 19, 2010 consultative psychological examination performed by Drs. Freeman and Rose who (based on Plaintiff's history, their review of records, psychological testing and clinical examination, as discussed above) diagnosed Plaintiff with depressive disorder not otherwise specified,

mild to moderate and chronic and with a Global Functioning Score of 60,[10] and found that Plaintiff had a very slight impairment in her abilities to comprehend and follow instructions, no impairment in her ability to perform simple and repetitive tasks, slight impairment in her ability to maintain a work pace appropriate to a given work load, very slight to slight impairment in her ability to perform complex or varied tasks, slight impairment in her ability to relate to other people beyond giving and receiving instructions, slight impairment in her ability to influence people, very slight to slight impairment in her ability to make decisions, evaluations, judgments or generalizations without immediate supervision, and very slight to slight impairment in her ability to accept and carry out responsibility for direction, control and planning (see AR 751-52, 758-60); and (b) the findings at the September 29, 2009 psychiatric examination, as discussed above. See Thomas v. Barnhart, supra ("The opinions of non-treating or non-examining physicians may also serve as substantial evidence when the opinions are consistent with independent clinical findings and evidence in the record.").

---

[10]   A Global Assessment Functioning score of 51-60 indicates moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders*, Fourth Edition, Text Revision (DSM-IV-TR), 34 (2000).

"[T]he [GAF] score is used for treatment purposes and not for rating a person's ability to work." Deck v. Colvin, 2014 WL 7388792, *1 (9th Cir.).

**ORDER**

     For the foregoing reasons, the decision of the Commissioner is affirmed.


     LET JUDGMENT BE ENTERED ACCORDINGLY.


DATED: November 30, 2015

                                    /s/
                          ALKA SAGAR
                          UNITED STATES MAGISTRATE JUDGE